# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **CAROLINA VILLAGRAN, et al** | § | **CIVIL ACTION NO. 2:22-cv-00170** |
| *Plaintiffs* | § | |
| | § | **JUDGE JAMES D. CAIN, JR.** |
| **V.** | § | |
| | § | **MAGISTRATE JUDGE** |
| **LA HERRADURA LLC and** | § | **KATHLEEN KAY** |
| **RIGOBERTO MELENDEZ** | § | |
| *Defendants* | § | |

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
---

Respectfully Submitted:

**SUDDUTH & ASSOCIATES, L.L.C.**
1109 Pithon Street
Lake Charles, LA 70601
Telephone: (337) 480-0101
Facsimile: (337) 419-0507
Email: *james@saa.legal*

*/s/ James E. Sudduth, III*
JAMES E. SUDDUTH, III (#35340)
KOURTNEY L. KECH (#37745)
*Counsel for Defendants*

# TABLE OF CONTENTS

FACTUAL BACKGROUND .................................................................................1

1.  The Gerstner Memorial Restaurant Closes Down and Is Inoperative Following
    Hurricanes Laura and Delta ..................................................................1

2.  Rigoberto Melendez Contracted Longtime Friend, Guadalupe "Lupita" Villagran
    With an Opportunity to Operate a Restaurant......................................2

3.  The Parties Fundamentally Dispute Any Work Performed Prior to June 14, 2021 ............2

4.  El Patron Operates From June 14, 2021 Through September 8, 2021 .............................4

    A.  A Dispute Exists as To Whether or Not Patricia Villagran was an Employee ........4

    B.  Lupita Self-Determined Pay Rates for All Family Member- Employees;
        However, a Fact Dispute Exists as to the Purported Amounts ...............................5

PROCEDURAL BACKGROUND....................................................................7

STANDARD OF REVIEW ...............................................................................8

LAW AND ARGUMENT ..................................................................................9

I.      Plaintiffs' FLSA Claims Must Be Dismissed in Their Entirety - Defendants
        Are Not Subject to the FLSA ..................................................................9

        A.  FLSA: Covered Employers...................................................................9

            1.  Legal Standard for FLSA Entitlement ....................................10

                i.    Individual Coverage...................................................10

                ii.   Enterprise Coverage..................................................11

            2.  Application to Plaintiffs' Claims .............................................12

                i.    Plaintiffs Cannot Establish Individual Coverage ...........................12

                ii.   Plaintiffs Cannot Establish Enterprise Coverage ..........................14

            3.  Alternatively, Plaintiffs Are Not Covered Pursuant to 29 U.S.C.
                203(s)(2)................................................................................18

II.     Because Plaintiffs' FLSA Claims Do Not Survive, Plaintiffs Are Not Entitled
        to Liquidated Damages, Attorney's Fees, or Costs Associated with the FLSA
        Claims ........................................................................................................................19

CONCLUSION............................................................................................................................19

# TABLE OF AUTHORITIES

**CASE LAW**

*Alvarez v. Mulberry Rest., Inc*.,
2012 WL 4639154 (S.D.N.Y. Oct. 3, 2012) ................................................................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2595, 2510, 91 L. Ed. 2d 202 (1986)......................................8

*D.A. Schulte, Inc. v. Gangi*,
328 U.S. 108, 120, 66 S.Ct. 925, 90 L. Ed. 1114 (1946)..............................................10

*Dinh v. WeRunTexas, LLC,*
2019 WL 4034360 (S.D. Tex. Aug. 26, 2019) .............................................................17

*Donovan v. I-20 Motels, Inc.*,
664 F.2d 957 (5th Cir. 1981) .......................................................................................15

*Dunlop v. Ashy*,
555 F.2d 1228 (5th Cir. 1977) .....................................................................................14

*Duran v. Wong*,
2012 WL 5351220 (S.D. Tex. Oct. 23, 2012)...............................................................12

*Ecoquij-Tzep v. Grill*,
2016 WL 3745685 (N.D. Tex. Jul. 12, 2016) ...............................................................12

*Flores v. Nuvoc, Inc.*,
610 F. Supp. 2d 1349 (S.D. Fl. Nov. 20, 2008) ...........................................................17

*Johnson v. Heckmann Water Res. (CVR), Inc*.,
758 F.3d 630 (5th Cir. 2014) .........................................................................................9

*Lopez v. Top Chef Inv., Inc.,*
2007 WL 4247646 (S.D. Fla. Nov. 30, 2007)...............................................................13

*Lopez–Santiago v. Coconut Thai Grill,*
2014 WL 840052 (N.D. Tex. Mar. 4, 2014) ......................................................12, 14, 18

*Martin v. Bedell*,
955 F.2d 1029 (5th Cir.1992) .........................................................................................9

*Martin v. Briceno*,
2014 WL 2587484 (S.D. Fla. June 10, 2014) ..........................................................12, 13

*Martinez v. Palace,*
414 Fed. Appx. 243 (11th Cir. 2011) .......................................................................13

*McLeod v. Threlkeld,*
319 U.S. 491, 63 S.Ct. 1248, 87 L. Ed. 1538 (1943) .........................................10, 13

*Mejia v. Bros. Petroleum*, LLC,
2015 WL 3619894 (E.D. La. June 9, 2015) .............................................................12

*Mitchell v. C.W. Vollmer & Co.,*
349 U.S. 427, 75 S. Ct. 860, 862, 99 L. Ed. 1196 (1955) ...................................11, 12

*Mitchell v. H.B. Zachry Company,*
362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960) ..................................................10

*Ovalle v. DRG Concepts, LLC,*
2018 WL 2762553 (N.D. Tex. June 8, 2018) ...........................................................12

*Payne v. Sparkles Hamburger Spot, LLC.,*
2018 WL 6517463 (S.D. Tex. Aug. 14, 2018) ..........................................................13

*Petasne v. La Cucina & Bakery, LLC,*
2008 WL 2157036 (M.D. Fla. May 20, 2008) ..........................................................13

*Reagor v. Okmulgee Cnty. Family Res. Ctr.,*
501 Fed. Appx. 805 (10th Cir. 2012) ..................................................................18, 19

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133, 120 S. Ct. 2097. 2110, 147 L. Ed. 2d 105 (2000) ...................................8

*Secretary of Labor v. Timberline South, LLC,*
925 F. 3d 838 (6th Cir. 2019) ..................................................................................15

*Singer v. City of Waco, Tex.,*
324 F.3d 813 (5th Cir. 2003) ....................................................................................19

*Sobrinio v. Med. Ctr. Visitor's Lodge, Inc.,*
474 F.3d 828 (5th Cir. 2007) ......................................................................................9

*Williams v. Henagan,*
595 F.3d 610 (5th Cir. 2010) ...............................................................................11, 12

*Wirtz v. Wohl Shoe Company,*
382 F.2d 848 (5th Cir.1967) ................................................................................10, 11

**STATUTES**

29 C.F.R. § 779.213 ...................................................................................................14

29 C.F.R. § 779.234 ...................................................................................................18

29 U.S.C. § 203(i) ......................................................................................................11

29 U.S.C. § 203(r)(1) .................................................................................................14

29 U.S.C. § 203(s)(1)(A) ......................................................................................11, 14

29 U.S.C. 203(s)(2) ....................................................................................................18

29 U.S.C. § 206(a)(1) .................................................................................................10

29 U.S.C. § 207(a)(1) .................................................................................................10

29 U.S.C. 216(b) ........................................................................................................19

Fed. R. Civ. P 56(c) .....................................................................................................8

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **CAROLINA VILLAGRAN, et al** | § | **CIVIL ACTION NO. 2:22-cv-00170** |
| *Plaintiffs* | § | |
| | § | **JUDGE JAMES D. CAIN, JR.** |
| **V.** | § | |
| | § | **MAGISTRATE JUDGE** |
| **LA HERRADURA LLC and** | § | **KATHLEEN KAY** |
| **RIGOBERTO MELENDEZ** | § | |
| *Defendants* | § | |

---

## EXHIBIT LIST

---

EXHIBIT A:        Deposition Transcript of Rigoberto Melendez

EXHIBIT B:        Deposition Transcript of Raul Mendez

EXHIBIT C:        Deposition Transcript of Mariana Bustos

EXHIBIT D:        Deposition Transcript of Guadalupe "Lupita" Villagran

EXHIBIT E:        Deposition Transcript of Francisco Javier Perez

EXHIBIT F:        Deposition Transcript of Jorge Aranda

EXHIBIT G:        Deposition Transcript of Joel Rosas

EXHIBIT H:        Deposition Transcript of Carolina Villagran

EXHIBIT I:        Deposition Transcript of Patricia Villagran

EXHIBIT J:        2021 Capital One Bank Statements

EXHIBIT K:        Text Messages between Raul Mendez and Lupita Villagran

**MAY IT PLEASE THE COURT:**

## FACTUAL BACKGROUND

Defendants have submitted a contemporaneous response to Plaintiffs' Statement of Uncontested Facts, and they respectfully reincorporate those responses and record citations as if fully set forth herein. That being said, Defendants offer the following, material facts:

Rigoberto Melendez is an owner of La Herradura, LLC[1], which is the Louisiana liability company that has operated a local Mexican restaurant - the names and management of which have changed over time - at 2624 Gerstner Memorial Drive, Lake Charles, Louisiana (hereinafter the "Gerstner Memorial restaurant").

At all relevant times to the instant wage dispute, La Herradura, LLC owned the restaurant "El Patron" at the Gerstner Memorial location (Ex. A, p. 12-14; Ex. B, p. 11; Ex. C, p. 17-18; Ex. D, p. 23). During the relevant timeframe, La Herradura, LLC only operated El Patron (Ex. A, p. 14-15).

1. **The Gerstner Memorial Restaurant Closes Down and Is Inoperative Following Hurricanes Laura and Delta**

According to Mr. Melendez, Hurricane Laura (which occurred on August 27-28, 2020) damaged the air conditioning and bell of the Gerstner Memorial restaurant, which, prior to the Hurricane, operated under the name of El Tapatio Mexican Restaurant, or "El Tapatio" (Ex. A, p. 27). Upon closure of El Tapatio around the time of Hurricane Laura, the Gerstner Memorial restaurant remained "closed for a long time" (Ex. A, p. 27).

Following Hurricanes Laura and Delta, Mr. Melendez decided to reopen the Gerstner Memorial restaurant under a new name and management (Ex. A, p. 27).

---

[1] Mr. Melendez became an owner of La Herradura, LLC on or about September 8, 2005 (Ex. A, p. 14). Guadalupe Yesenia "Lupita" Villagran also claimed to be an owner of El Patron, at least in part (Ex. D, p. 23-24).

### 2. Rigoberto Melendez Contacts Longtime Friend, Guadalupe "Lupita" Villagran, With an Opportunity to Operate a Restaurant

Mr. Melendez had a longstanding relationship and friendship with Plaintiff, Guadalupe "Lupita" Villagran ("Lupita"), with whom Mr. Melendez lived close to in Mexico for several years.[2] According to Mr. Melendez, any time he would speak with Lupita, she would indicate her desire to open and run a restaurant (Ex. A, p. 24-25).

In an effort to afford Lupita an opportunity, Mr. Melendez told Lupita that she could open and operate the Gerstner Memorial location under a new restaurant/name (Ex. D, p. 21-22). Mr. Melendez instructed Lupita that she would have to clean the tables, kitchen, floor, and coolers, as well as "check to see if everything was working correctly," before opening the restaurant, which had been inoperative for a substantial period of time (Ex. A, p. 28-29).

During the conversation, Mr. Melendez indicated to Lupita that she would have to relocate from Texas to Louisiana in order to operate the Gerstner Memorial restaurant (Ex. A, p. 37-38). At no time whatsoever did Mr. Melendez ever agree to provide Lupita a down payment for a home or any sort of payment for purchasing a home in Louisiana (Ex. A, p. 98).

### 3. The Parties Fundamentally Dispute Any Work Performed Prior to June 14, 2021

Though Plaintiffs did not address this factual dispute in its Motion, Mr. Melendez firmly disputes that Plaintiffs performed compensable work from February through June. According to Mr. Melendez, Plaintiffs' contention that they worked on the building from February 2021 through June 2021 is false because was it "too much time" (Ex. A, p. 30-31).

According to Mr. Melendez, Plaintiffs:

---

[2] Carolina Villagran revealed that Mr. Melendez was previously in a relationship with Patricia Villagran. Patricia never revealed that information during her deposition (Ex. H, p. 16-17). Lupita confirmed that Mr. Melendez was a friend of the family (Ex. D, p. 20).

would come from Texas. So they would come, like, one day and then they would be there -- I would be happy because they would come to work. But they would be there, like, one day. And then the next [to](sic) day they would go back to Texas. Then they would wait like a week or two before they came back, and they would go back again. So that's how their dynamic was. I don't think they really was committing to coming to work (Ex. A, p. 36).

Mr. Melendez testified that he hired various individuals, such as Kenon Elvis, to paint (Ex. A, p. 29-30, 32-33), so that all Lupita and any individuals she hired would have to do is clean and mop. Mr. Melendez testified that Plaintiffs would have not performed any more than approximately one (1) week of work between February and June 2021[3] (Ex. A, p. 34-35). Despite Plaintiffs' statements to the contrary, Lupita herself testified that she and her husband came to Lake Charles "like two times a week" or "16 times in two months" (Ex. D, p. 27-29). She admitted that some of the other Plaintiffs would "sometimes" come (Ex. D, p. 29).

There was no written agreement about compensating Lupita or any other Plaintiff for cleaning the restaurant prior to it opening in June 2021 (Ex. A, p. 38-39). Instead, Lupita would simply contact Mr. Melendez, ask for a certain amount per day, in addition to money for food, gas, and hotel, and Mr. Melendez would reach an agreement about the payment for any given day (Ex. A, p. 40-41). Mr. Melendez testified that he would negotiate with either Lupita or her husband, Plaintiff, Francisco Javier Perez, because of their friendship, on what to pay (Ex. A, p. 41-42). Mr. Melendez testified that only Lupita and Francisco came to get the restaurant ready (Ex. A, p. 42). According to Mr. Melendez, the remaining Plaintiffs only came to the restaurant "about one or two weeks before the restaurant opened" (Ex. A, p. 42).

Plaintiffs' own testimony creates a materially disputed fact as to: 1) whether Defendants ever agreed to pay any Plaintiff for cleaning work performed prior to the opening of El Patron; or

---

[3] Mr. Melendez went to check out the Gerstner Memorial restaurant following the storms and testified that "the inside of the restaurant was good" and that deep cleaning/detailing was all that was needed" (Ex. A, p. 35).

2) the amount of any payment. In her deposition, Lupita asserted that there was an agreement that each person would receive $500.00 per week (Ex. D, p. 32-33).

Mr. Melendez paid both Lupita and Francisco for their pre-opening work (Ex. A, p. 43-44, 57-58). Additionally, when Lupita asked Rigoberto for $10,000, "she said that's all you -- we need -- that's all Rigo owe me. And after that, we start like fresh, you know. Like she was paid off with the 10,000. And that's all. [S]he say that she -- that she -- that Rigo owe her" (Ex. B, p. 39).

### 4. El Patron Operates From June 14, 2021 Through September 8, 2021

El Patron opened for business on or about June 14, 2021 (Ex. A, p. 64-65: Ex. E, p. 16), and the restaurant ultimately closed on September 8, 2021 - less than three (3) months later (Ex. A, p. 70; Ex. C, p. 30; Ex. I, p. 32).

According to Mr. Melendez:

[Lupita] then brought her people. So they people that she brought was all of her family members. And you know, sometimes family members, they don't -- they don't follow rules. And you tell them to do something, they don't do it because they're your brother-in-law, your cousin. So they don't listen (Ex. A, p. 24)

Here, there is no material dispute that the regular employees of the El Patron establishment were as follows: 1) Lupita; 2) her husband, Francisco Javier Perez[4]; 3) her sister, Carolina Villagran[5]; 4) her brother-in-law, Joel Rosas[6]; and 5) her brother-in-law, Jorge Aranda.[7]

### A. A Dispute Exists as to Whether or Not Patricia Villagran Was an Employee

Based on record evidence, Defendants dispute that Patricia Villagran was ever an employee of La Herradura LLC d/b/a El Patron or otherwise ever performed any work for the company whatsoever. Mariana Bustos, the individual hired to perform remote payroll services during the

---

[4] Ex. D, p. 34; Ex. E, p. 12.
[5] Ex. I, p. 47.
[6] Ex. G, p. 11; Ex. H, p. 13.
[7] Aranda, though "unmarried," has been longtime partner of Lupita's sister, Paulina Villagran (Ex. F, p. 11-12).

relevant timeframe, confirmed that she would receive payroll information for all employees from Lupita and would simply make pay stubs based on the information provided to her by Lupita (Ex. C, p. 16-18, 21-22). Lupita would send Ms. Bustos a text with the names and hours each person worked, and Ms. Bustos generated stubs based off of whatever Lupita sent her (Ex. C, p. 22). That being said, Ms. Bustos did not have Patricia Villagran on her employee list for La Herradura, LLC at any time (Ex. C, p. 23-24). Additionally, no W-2 or paystubs were issued to Patricia Villagran.

### B. Lupita Self-Determined Pay Rates for All Family Member-Employees; However, A Fact Dispute Exists as to The Purported Amounts

Notwithstanding the foregoing dispute regarding Patricia Villagran, according to Mr. Melendez, there was never an agreement on individual employee pay (Ex. A, p. 44). Instead, Lupita would determine an amount and pay that amount, and Raul Mendez would disagree with the amount paid (Ex. A, p. 44-45; Ex. D, p. 59-60). Mr. Melendez confirmed that Lupita made the decision on how much each person should be paid, and both Mr. Melendez and Mr. Mendez noted their concern that it was far too much (Ex. A, p. 46). Mr. Mendez actually told Lupita that, at the rates she had decided to pay, the "restaurant would not be able to sustain itself because it wasn't a lot of clients because of the hurricane" (Ex. A, p. 49).

During this timeframe, employees tracked their time through Lupita - she was the "one that carried the hours" (Ex. A, p. 66). Lupita was in charge of payroll, and Lupita self-determined the pay rates for her family member-employees (Ex. A, p. 66; Ex. E, p. 29; Ex. I, p. 22). With the sole exception of Carolina Villagran, each of the Plaintiffs confirmed that, irrespective of the hours worked, they were given bi-weekly paychecks in the corresponding amounts (Ex. E, p. 27; Ex. F, p. 13; Ex. G, p. 21; Ex. I, p. 16). Moreover, accounting records confirm that, while Lupita was charged with submitting the employee time to Ms. Bustos for processing, Lupita never submitted

any overtime hours for any Plaintiff (Ex. C, p. p. 26-28). Instead, it appears that, notwithstanding Carolina,[8] Lupita paid Plaintiffs a straight, bi-weekly rate, irrespective of hours worked.

Lupita confirmed that, not only the waitresses, but the entire family shared the tips (Ex. D, p. 53-54). Not only that, but Lupita indicated that, when the restaurant first opened, she was paying everyone's wages in cash (Ex. D, p. 56). After a month of Lupita paying wages in cash, Lupita informed Mr. Mendez of the same. After immediately instructing Lupita that cash payments were improper, Mr. Mendez connected her with Ms. Bustos to assist with proper accounting going forward (Ex. D, p. 56-57).

The Plaintiffs' testimony creates a disputed fact as to how much, if anything, the parties agreed to re: bi-weekly rates. As the individual who determined the rates, Lupita testified that Plaintiffs earned the following, bi-weekly rates: 1) Francisco Perez - $1,500; 2) Jorge Aranda - $1,600; 3) Joel Rosas - $1,500; 4) Carolina Villagran - $300 for waitressing[9]; 5) Patricia Villagran - $800[10]; and 6) Lupita - $1,500 (Ex. D, p. 48). Patricia Villagran, however, testified that she was entitled to bi-weekly payments of $1,200.00, in addition to tips (Ex. I, p. 16, 18-19). Carolina Villagran could not provide any clarification, aside from stating that she would receive $100 in cash for each day worked as a cashier, regarding her pay rates (Ex. H, p. 28, 40, 43-44). There is also no record whatsoever as to which days Carolina worked as a waitress, as opposed to a cashier.

---

[8] Carolina testified that she worked as a waitress and cashier (Ex. H, p. 28). She claims that she was paid largely in cash (Ex. H, p. 40). She also has no knowledge of any bi-weekly check she was to receive (Ex. H, p. 43-44).
[9] Lupita testified that, due to low customer traffic and accompanying tips, waitresses started at $300 bi-weekly, which was reduced over time (Ex. D, p. 52-53).
[10] Lupita indicated that Patricia took chips and salsa to the tables (Ex. D, p. 48).

Due to lack of funds to continue operation, El Patron ceased operation on or about September 8, 2021.[11] Less than two days later, on September 10, 2021, Mendez sent the following message (translated) to Lupita:

> I am going tomorrow. Give me directions where to send the payments of the boys. I am going to get the checkbook. You tell me at the address of the new Benito or his phone number (Ex. K).

Lupita clarified that the original text contained several grammatical errors and interpreted the text to mean the following:

> I am going tomorrow just in case you want to give me the addresses where to send the payment of the boys. I am going to get the checkbook. You let me know and the address of the new Benito[12] or his phone number (Ex. D, p. 86-87).

Instead of agreeing to meet with Mendez to collect any outstanding payment, Lupita sent the following response (translated):

> Raul, this is a good feeling. My lawyer tells me not to speak with you nor no one. Nor Rigo. That they will take care of everything. They only ask me for all the receipts that I paid and the original stubs. I already gave everything. The department of labor is going to communicate with you to see everything (Ex. D, p. 87; Ex. K).

Despite Mr. Mendez's good faith attempt to meet with Lupita and pay outstanding wages for the last two pay periods, Lupita refused to meet with Mr. Mendez. Instead, the instant suit followed.

## PROCEDURAL BACKGROUND

Plaintiffs initiated suit against La Herradura, LLC and Rigoberto Melendez on January 19, 2022 [D.E. 1]. Therein, Plaintiffs alleged that Defendants violated the payments provisions of both the Fair Labor Standards Act ("FLSA") and the Louisiana Wage Payment Act ("LWPA"), as well

---

[11] Mr. Mendez told Lupita that checks began bouncing because she had overspent on the Capital One account (Ex. D, p. 74). Mr. Mendez contacted Lupita and indicated that they were going to have to close the restaurant because there was no more money (Ex. D, p. 79).

[12] According to Lupita, Benito came to help at the restaurant for three (3) weeks and had been paid in cash (Ex. D, p. 86-87).

as a claim for breach of contract, unjust enrichment, and detrimental reliance and/or promissory estoppel [D.E. 1]. Plaintiffs filed a First Superseding and Amending Complaint on January 31, 2022, setting forth identical claims [D.E. 3]. Then, on June 5, 2023, Plaintiffs sought to amend their Complaint to include an additional Defendant, Rigo's Enterprise, LLC, which was allowed by the Court and filed into the record on July 19, 2023 [D.E. 22, 23].

Per the Court's Scheduling Order, and while Plaintiffs' Motion for Leave to submit an amended complaint remained pending, Plaintiffs filed the instant Motion for Partial Summary Judgment on July 12, 2023 [D.E. 20, 21]. Plaintiffs' Motion seeks summary judgment ***only*** as to Plaintiffs' claims arising under the FLSA [D.E. 20, 21]. As such, Defendants only address arguments pertaining to Plaintiffs' FLSA claims, and they reserve for trial all arguments pertaining to any and all other pending claims, including, but not limited to, the alleged LWPA violation.[13]

## STANDARD OF REVIEW

Summary judgment is only proper when the moving party demonstrates that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2595, 2510, 91 L. Ed. 2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. at 248. In applying the summary judgment standard, the Court must evaluate the evidence and the record, taken as a whole, in the light most favorable to the party opposing the motion – here, Plaintiff. *Id*. The nonmovant's evidence is to be believed, and all justifiable inferences are to

---

[13] The FLSA creates liability for employers engaged in interstate commerce who fail to pay their employees minimum wage or overtime pay for hours worked in excess of 40 hours per week. See 29 U.S.C. §§ 206 and 207. The LWPA does not address minimum wage or overtime. Rather, the LWPA requires employers to pay their employees, upon discharge, "the amount due to them under the terms of employment." *See* La. R.S. 23:631(A)(1)(a). The LWPA makes no distinction between regularly earned wages and wages earned as a result of overtime hours. *Hampton v. McDermott International, Inc.,* 2019 WL 5617025 (W.D. La. Oct. 30, 2019) (citing *England v. Adm'rs of the Tulane Educ. Fund*, 2016 WL 6520146 (E.D. La. Nov. 3, 2016)).

be drawn in the nonmovant's favor. *Id.* at 255. Moreover, the Court must avoid a "trial on the affidavits." *Id.* at 255. Thus, it may not make credibility findings, weigh the evidence, or resolve factual disputes, as those are tasks specifically reserved for the trier-of-fact. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097. 2110, 147 L. Ed. 2d 105 (2000).

## LAW AND ARGUMENT

**I.     Plaintiffs' FLSA Claims Must Be Dismissed In Their Entirety - Defendants Are Not Subject to the FLSA**

Plaintiffs' entire Motion is based upon the faulty premise that Plaintiffs are entitled to the protections afforded to employees under the Fair Labor Standards Act ("FLSA") [D.E. 20-1, p. 9-15]. Plaintiffs' Motion, however, ignores established precedent indicating that the ***employee*** bears the burden of establishing entitlement to the FLSA's protections. *See Sobrinio v. Med. Ctr. Visitor's Lodge, Inc.*, 474 F.3d 828, 829 (5th Cir. 2007) (per curiam)(emphasis added). To establish this burden, an employee ***must*** demonstrate that: (1) she personally engaged in commerce or the production of goods for commerce ("individual coverage") or (2) she worked for an enterprise engaged in such activity ("enterprise coverage"). *Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992). Plaintiffs have failed to establish either individual coverage or enterprise coverage and, thus, have failed to establish any viable claims under the FLSA. Accordingly, not only must Plaintiffs' partial motion for summary judgment - *which only addresses Plaintiffs' FLSA claims -* be denied in its entirety, but Plaintiff's FLSA claims must be dismissed in their entirety.

### A.  FLSA: Covered Employers

An FLSA claim requires that: (1) an employer-employee relationship existed during the claimed unpaid overtime periods; (2) the employee was involved in activities within FLSA coverage; (3) the employer violated the wage requirement; and (4) the amount of compensation owed. *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014).

Defendants do not dispute that an employer-employee relationship existed between La Herradura, LLC and Plaintiffs (except Patricia Villagran) from June through September 2021. That being said, however, Plaintiffs have failed to establish - and cannot establish - that they were involved in activities "within FLSA coverage" necessary to establish the second prong.

### 1.   Legal Standards for FLSA Entitlement

Consistent with Congress's power to regulate interstate commerce, the minimum wage and overtime provisions of the FLSA provisions only apply (1) to an employer that has "employees who in any workweek [are] engaged in commerce or in the production of goods for commerce" ("individual coverage"), or (2) to an employer that has employees "employed in an enterprise engaged in commerce or in the production of goods for commerce" ("enterprise coverage"). *See* 29 U.S.C. § 206(a)(1) and 29 U.S.C. § 207(a)(1); for the terms "individual coverage" and "enterprise coverage," *see, e.g., Martin*, 955 F.2d 1029, 1032 (5th Cir.), *cert. denied*, 506 U.S. 915, 113 S.Ct. 323, 121 L.Ed.2d 243 (1992). To establish that an employer is subject to the requirements of the FLSA, ***the plaintiff employee has the burden to show that there is coverage, whether individual or enterprise***. *See, e.g., D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 120, 66 S.Ct. 925, 90 L. Ed. 1114 (1946) (emphasis added).

### i.   Individual Coverage

The phrase "employees who in any workweek [are] engaged in commerce or in the production of goods for commerce" is not statutorily defined. Courts in the Fifth Circuit have interpreted the "engaged in commerce" language in 29 U.S.C. §§ 206(a)(1) and 207(a)(1) by applying a "practical test," which looks to whether an employee's work "is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." *See Sobrinio,* 474 F.3d at 829

(quoting *Mitchell v. H.B. Zachry Company*, 362 U.S. 310, 324, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960).

The Supreme Court has also explained that the test is whether "the employee's activities ... are

actually in or so closely related to the movement of the commerce as to be a part of it." *McLeod v.*

*Threlkeld*, 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L. Ed. 1538 (1943). It is settled that Congress did

not regulate to the full extent of its power under the Commerce Clause when it enacted the FLSA.

*See Wirtz v. Wohl Shoe Company*, 382 F.2d 848, 850 (5th Cir.1967) ("it is now settled that in

enacting the FLSA Congress did not exercise the full scope of its authority to regulate the working

conditions of employees whose activities merely affect commerce"). It is insufficient, for purposes

of the "engaged in commerce" clause of the individual coverage provision, that an employee's

work merely "affects" interstate commerce in some way. *Id.* It must be a part of commerce.

### ii.  Enterprise Coverage

Congress did define the phrase "enterprise engaged in commerce or in the production of

goods for commerce." Such an enterprise is one that "(i) has employees engaged in commerce or

in the production of goods for commerce, or that has employees handling, selling, or otherwise

working on goods or materials that have been moved in or produced for commerce by any person;

and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than

$500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. §

203(s)(1)(A). "Goods" are defined in the statute as "goods (including ships and marine equipment),

wares, products, commodities, merchandise, or articles or subjects of commerce of any character,

or any part or ingredient thereof, but does not include goods after their delivery into the actual

physical possession of the ultimate consumer thereof other than a producer, manufacturer, or

processor thereof." 29 U.S.C. § 203(i).

### 2.  Application to Plaintiffs' Claims

#### i.  Plaintiffs Cannot Establish Individual Coverage

As noted above, an employee is entitled to "individual coverage" when "the [employee's] work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity. *Mitchell v. C.W. Vollmer & Co*., 349 U.S. 427, 429, 75 S. Ct. 860, 862, 99 L. Ed. 1196 (1955). Work that is purely local in nature does not meet the FLSA's requirements. *Williams v. Henagan*, 595 F.3d 610, 621 (5th Cir. 2010) (citing *Sobrinio*, 474 F.3d at 829)).

By servicing a single, local restaurant as dishwashers,[14] waitresses,[15] and cooks[16], Plaintiffs were merely engaged in a purely local activity and, thus, ***not*** subject to "interstate commerce" that could subject La Herradura, LLC to FLSA liability under either the enterprise or individual theory. *See, e.g*., *Duran v. Wong,* 2012 WL 5351220 (S.D. Tex. Oct. 23, 2012) (finding that allegations that plaintiff "used products that had traveled in interstate commerce" in the course of his duties as a dishwasher and kitchen helper at a local restaurant was insufficient to establish individual coverage under the FLSA); *Ovalle v. DRG Concepts, LLC,* 2018 WL 2762553, at *4 (N.D. Tex. June 8, 2018) (rejecting individual coverage of a cashier, reasoning that processing credit cards from out-of-state customers was insufficient); *Ecoquij-Tzep v. Grill,*  2016 WL 3745685 (N.D. Tex. Jul. 12, 2016) (finding that the "mere fact that [plaintiff] was a server and cashier is not enough"); *Lopez–Santiago v. Coconut Thai Grill,* 2014 WL 840052, at *4 (N.D. Tex. Mar. 4, 2014)(finding complaint that only asserted plaintiffs' job titles (i.e., a cook and dishwasher) was

---

[14] Joel Rosas testified was hired and performed work as a dishwasher. (Ex. B, p. 44-45; Ex. G, p. 19).
[15] Patricia Villagran testified that she was hired as waitress (Ex. I, p. 14-15). Carolina Villagran testified that she worked as both a waitress and a cashier (Ex. H, p. 28-29).
[16] Jorge Aranda testified that he was hired to work in the kitchen as a cook (Ex. B, p. 44-45; Ex. D, p. 52; Ex. E, p. 26-27; Ex. F, p. 19-20; Ex. H, p.21). Additionally, Francisco Perez described himself as a "planchero" who worked the grill and assisted Jorge Aranda in the kitchen (Ex. B, p. 44-45; Ex. E, p. 26; Ex. F, p. 19).

insufficient to raise a right to relief above speculative level because it did not show how the work engages plaintiffs in interstate commerce, warranting a motion to dismiss under 12(b)(6)); *Mejia v. Bros. Petroleum*, LLC, 2015 WL 3619894, at *5 (E.D. La. June 9, 2015) (finding bare allegations that plaintiffs worked as cashiers, cooks, and store operators at convenience stores to be insufficient to state a claim for individual coverage); *Martin v. Briceno*, 2014 WL 2587484, at *1 (S.D. Fla. June 10, 2014) (finding servers, waiters, bartenders, hostesses, cooks, and bus boys were not engaged in commerce); *Petasne v. La Cucina & Bakery, LLC,* 2008 WL 2157036, at *3 (M.D. Fla. May 20, 2008) (finding a server in a local restaurant was not entitled to assert individual coverage); *Martinez v. Palace*, 414 Fed. Appx. 243, 246 (11th Cir. 2011) (per curiam) ("Given that the cook in *McLeod [v. Threlkeld*, 319 U.S. 491, 63 S.Ct. 1248, 87 L. Ed. 1538 (1943) ], whose work was tangentially related to an instrumentality of interstate commerce (the railroads), was not 'engaged in commerce,' it is difficult to see how ... a cook in a public restaurant, could qualify for this particular type of FLSA coverage."); *Alvarez v. Mulberry Rest., Inc*., 2012 WL 4639154, at *2 n. 2 (S.D.N.Y. Oct. 3, 2012) ("Defendants are correct that a dishwasher is not inherently 'engaged in commerce' under the FLSA, as numerous cases within this circuit involving analogous positions at local eateries have held."); *Lopez v. Top Chef Inv., Inc.,* 2007 WL 4247646, at *2 (S.D. Fla. Nov. 30, 2007) ("The mere fact that the food may have passed in interstate commerce prior to arriving at the restaurant does not mean that the Plaintiff was engaged in commerce for individual coverage."); *Payne v. Sparkles Hamburger Spot, LLC*., 2018 WL 6517463, at *3 (S.D. Tex. Aug. 14, 2018)( "mere usage of credit cards is insufficient for purposes of establishing FLSA individual coverage.").

Like the plaintiffs in the above-cited cases, Plaintiffs did not produce any evidence to show that their work was directly related to interstate commerce under the FLSA; rather, the only

evidence is Plaintiffs' testimony as to their respective job titles at a local, family operated Lake Charles restaurant that they operated for three months - nothing more (Exs. D, E, F, G, H, I *in globo*). None of Plaintiffs' three (3) Complaints, Plaintiffs' discovery responses, nor their testimony offer a shred of evidence from which it could even be arguably inferred that any one of their jobs involved commerce. Indeed, the record is void of any factual assertions that could lead the Court (which, here, is factfinder) to determine that Plaintiffs' jobs were anything more than simple, isolated, local activity.

Plaintiffs have not, and cannot, meet their burden of establishing individual coverage under the FLSA. For this reason, Plaintiffs' Motion must be denied, and Plaintiffs' FLSA claims must be dismissed for failure to establish a principal element of their FLSA claim(s).

### ii.   Plaintiffs Cannot Establish Enterprise Coverage

Plaintiffs likewise cannot establish enterprise coverage. The FLSA defines "enterprise engaged in commerce or in the production of goods for commerce" as an enterprise[17] that:

(i)   has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; ***and***

---

[17] "Enterprise" is defined, in part, as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor." 29 U.S.C. § 203(r)(1). While an "enterprise" may consist of multiple entities, the entities must (1) perform related activities; (2) be under unified operation or common control; and (3) share a common business purpose. *Dunlop v. Ashy*, 555 F.2d 1228, 1231 (5th Cir. 1977) (citation omitted); *see also* 29 U.S.C. § 203(r). Entities have a "common business purpose" when their activities "are directed to the same business objective or to similar objectives in which the group has an interest." 29 C.F.R. § 779.213. "A common business purpose exists if 'the separate [entities] engaged in complementary businesses, and were to a significant degree operationally interdependent.'" *Reich v. Bay, Inc.*, 23 F.3d 110, 115-16 (5th Cir. 1994) (quoting *Donovan v. Janitorial Servs., Inc*., 672 F.2d 528, 530 (5th Cir. 1982)). This requires establishing "[m]ore than a common goal to make a profit." *Brennan*, 482 F.2d at 1367. Where, however, "the activities are not performed as a part of such enterprise but for an entirely separate and unrelated business, they will be considered performed for a different business purpose and will not be a part of that enterprise." 29 C.F.R. § 779.213.

(ii)      is an enterprise whose annual gross volume of sales made or business done
          is not less than $500,000[.]

29 U.S.C. § 203(s)(1)(A)(i)-(ii)(emphasis added).

Of material import to this case, courts have uniformly held that the gross sales volume or

business done limitation is an element of the plaintiff's claim. *Lopez-Santiago,* 2014 WL 840052

at * 3 (citing cases).

To determine enterprise coverage under the FLSA, courts use the "rolling quarter"

computation method promulgated by the Secretary of Labor and approved by the Fifth Circuit. *See*

*Donovan v. I-20 Motels, Inc.*, 664 F.2d 957, 958 (5th Cir. 1981). Under the rolling quarter method,

businesses determine FLSA coverage "at the beginning of each quarter ... by calculating annual

dollar volume based on the sum of the four preceding quarters." *Id.*

With this in mind, and similarly to Plaintiffs' failure to present any evidence even

suggesting that they engaged in interstate commerce under the individual coverage theory,

Plaintiffs present no argument or evidence regarding the 2020 or 2021[18] gross volume of sales or

business done by La Herradura, LLC. In fact, and likely because Plaintiffs know that they cannot

credibly claim sales anywhere near $500,000.00, Plaintiffs did not even plead this element in any

one of their three (3) Complaints [D.E. 1, 3, 23].

Indeed, to the contrary, Plaintiffs' own evidence suggests that La Herradura, LLC did not

generate anywhere near $500,000 in sales during the relevant timeframe. First, there is no material

dispute that the Gerstner Memorial restaurant did not operate in any way from, at the latest, August

27, 2020, through June 14, 2021. Since there was no restaurant operating, there were not any sales.

---

[18] There is no material dispute that Plaintiffs performed work operating La Herradura, LLC d/b/a El Patron during
2021 [D.E. 20-2, p. 1 ¶ 1]. See, e.g., *Secretary of Labor v. Timberline South, LLC,* 925 F. 3d 838, 844 (6th Cir. 2019)
(considering whether the alleged employer had "an annual gross volume of sales in excess of $500,000 for each
relevant year").

Even further, it is undisputed that El Patron opened for business on or about June 14, 2021 (Ex. A, p. 64-65),[19] and the restaurant ultimately closed on September 8, 2021 (Ex. A, p. 70; Ex. C, p. 30). That being said, Lupita herself acknowledged that, "at the beginning[20] it seems the restaurant was slow. There weren't -- there were not too many customers. . . ." (Ex. D, p. 53). Then, Mariana Bustos, the CPA/Accountant who submitted sales taxes documents for La Herradura, LLC d/b/a El Patron, noted that, for July 2021, the entity (by way of Lupita) had reported sales of only $37,972 (Ex. C, p. 33).[21] Additionally, El Patron's single, operating Capital One Account[22] was altogether overdrawn on August 30, 2021, and shows the total incoming funds to the account at far less than $500,000.00 from June through August 2021 (Ex. J). The fact that checks were bouncing toward the end of Plaintiffs' employment is even further evidence that El Patron was not generating sufficient sales, much less anywhere near $500,000.00 necessary to qualify the restaurant as an FLSA enterprise for purposes of establishing enterprise coverage.

Indeed, during her deposition, Lupita, who was tasked with communicating the sales to Bustos, testified that "we would get like $2,000 income a day" or gross revenues of $14,000 per week (Ex. D, p. 74-75). Even assuming, for the sake of argument, that Lupita's approximation is true, 87 days passed between June 14, 2021 and September 8, 2021, indicating, by Lupita's own approximation, El Patron would have generated a total of $174,000.00 in gross "income" throughout the entirety of El Patron's operation. This, of course, is only a third of what is required to establish enterprise FLSA coverage.

---

[19] Guadalupe Villagran herself acknowledged that, as a result of the Hurricane (which occurred on August 27, 2020), the restaurant was empty and free (Ex. D, p. 21-22). In other words, there is no material dispute that the restaurant did not generate sales of any kind from August 2020 through June 14, 2021.

[20] June 2021.

[21] Ms. Bustos indicated that she did not have sales documents for any other month, either because: 1) Lupita did not send her the information; or 2) because there were no sales (Ex. C, p. 37). The sales amount did not come from any register; rather, Lupita would just provide a sales amount to Ms. Bustos (Ex. C, p. 31-32).

[22] Mr. Melendez confirmed that the Capital One Account was the only account La Herradura, LLC used during Plaintiffs' employment and operation of El Patron (Ex. A, p. 51).

The lack of sales and poor restaurant performance is unsurprising. During his deposition, Raul Mendez stated:

> Q: How did - how did you know the business wasn't going to last?
>
> A: The way they talk  and all that stuff, you know. Like we in the restaurant business, and it's really hard. It's a very tough business, and they think it was real easy to do, and they got in really late, 11:00. They -- it was like a big family, and nobody can tell nobody to -- she was a manager, but she cannot tell nothing to the husband because he was the husband. She cannot tell the sisters what to do because they the sisters. So I'm like they going to -- you know, somebody have to run the business and tell you you got to be here at 10:00, and you going to lift this, and you going to do this, you going to do that. You cannot eat in the time when customers are there. Any they eat when customers they was there. They eat -- I mean, they don't what they doing in a restaurant business. They are good persons. Don't get me wrong. But I know they was no going to last. I'm like, hey, you know -- and I tell Rigoberto, say "You guys not going to make it. You guy guys going to be in debt pretty soon." And he was like, "Oh, well, let me see what's going on." But I tried to get out of there so they don't blame it on me, you know (Ex. B, p. 36-37).

Mr. Mendez actually told Lupita that, at the rates she had decided to pay her family member-employees, the "restaurant would not be able to sustain itself because it wasn't a lot of clients because of the hurricane" (Ex. A, p. 49). This is exactly what happened.

For the foregoing reasons, Plaintiffs did not, and cannot, produce evidence to show that La Herradura, LLC is an enterprise engaged in commerce as defined by the FLSA because they cannot establish that the entity generated at least $500,000.00 in sales during the relevant timeframe. As such, Plaintiffs' Motion must be denied in its entirety, and Plaintiffs' FLSA claims must be dismissed. *See Flores v. Nuvoc, Inc.*, 610 F. Supp. 2d 1349, 1357 (S.D. Fl. Nov. 20, 2008) (granting judgment as a matter of law for the defendants where the trial evidence established that the defendants' gross volume of sales or business done was less than $ 500,000); *Dinh v. WeRunTexas, LLC,*  2019 WL 4034360 (S.D. Tex. Aug. 26, 2019).

*{Remainder of Page Intentionally Left Blank}*

### 3.   Alternatively, Plaintiffs Are Not Covered Pursuant to 29 U.S.C. 203(s)(2)

While Defendants dispute that Guadalupe Villagran was ever an "owner" of La Herradura, LLC d/b/a El Patron, Villagran nevertheless testified that she was an owner, at least in part (Ex. D, p. 23-24).

Assuming, for the sake of argument, that the factfinder were to ultimately give credence to Villagran's assertion, Villagran's status as an owner would serve as an additional basis for non-application of the FLSA.

The FLSA specifically provides:

(2) Any establishment that has as its only regular employees the owner thereof or the parent, spouse, child, or other member of the immediate family of such owner shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce or a part of such an enterprise. The sales of such an establishment shall not be included for the purpose of determining the annual gross volume of sales of any enterprise for the purpose of this subsection.

29 U.S.C. 203(s)(2).

An interpretive regulation states:

The term "other member of the immediate family of such owner" is considered to include relationships such as brother, sister, grandchildren, grandparents, and in-laws but not distant relatives from separate households. The 1966 amendments extended the exception to include family operated establishments which only employ persons other than members of the immediate family infrequently, irregularly, and sporadically.

29 C.F.R. § 779.234.

Here, there is no material dispute that the *regular* employees of El Patron were either the husband, siblings, or in-laws of Lupita, who claims to be a part-owner of El Patron (Ex. D, p. 24-25). Thus, the "Mom and Pop" Exception to FLSA coverage found in 29 U.S.C. 203(s)(2) applies, and La Herradura, LLC d/b/a El Patron is not an "enterprise engaging in commerce" for purposes of the FLSA.

## II.     Because Plaintiffs' FLSA Claims Do Not Survive, Plaintiffs are Not Entitled to Liquidated Damages, Attorney's Fees, or Costs Associated with the FLSA Claims

An employer who *violates* the FLSA's minimum wage and overtime provisions is liable not only for the unpaid compensation but also for "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Here, however, because Plaintiffs have not established that the FLSA is applicable under the individual or enterprise theory, their FLSA claims fail. Consequently, absent an FLSA violation, there is no statutory basis for liquidated damages. *See, e.g., Lopez-Santiago,* 2014 WL 840052, at * 4 n. 6 (citing *Reagor v. Okmulgee Cnty. Family Res. Ctr.*, 501 Fed. Appx. 805, 810 (10th Cir. 2012) ("Because [the plaintiff] has failed to plausibly suggest that she engaged in interstate commerce, we cannot draw a reasonable inference that [the defendant] is liable for overtime pay under the FLSA.")).

Similarly, under the FLSA, an employer **who violates the statute** is also required to pay attorney's fees. 29 U.S.C. 216(b) ("The court ... shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant...."); *Singer v. City of Waco, Tex.*, 324 F.3d 813, 829 n. 10 (5th Cir. 2003) (emphasis added). As noted above, because Plaintiffs failed to establish that either individual coverage or enterprise coverage applies to the instant dispute, Plaintiffs' FLSA claims must fail as a matter of law. As such, because Defendant is not subject to the FLSA, it cannot, as a matter of logic, violate the statute.

For this reason, Plaintiffs' Motion must be denied, and Plaintiffs' claim for liquidated damages and attorney's fees pursuant to the FLSA must be dismissed accordingly.

## CONCLUSION

For the foregoing reasons, Plaintiffs have failed to establish that they are entitled to the protections of the FLSA. For this reason, their Motion should be denied in its entirety, and the Court should *sua sponte* dismiss Plaintiffs' FLSA claims. Alternatively, Defendants have, at the

very least, raised a materially disputed fact as to whether the FLSA applies, and Plaintiffs' Motion must be denied in its entirety.[23]

<div style="margin-left: 40%;">

Respectfully Submitted:

**SUDDUTH & ASSOCIATES, L.L.C.**
1109 Pithon Street
Lake Charles, LA 70601
Telephone: (337) 480-0101
Facsimile: (337) 419-0507
Email: james@saa.legal

</div>

BY:    */s/ James E. Sudduth, III*
              JAMES E. SUDDUTH, III (#35340)
              KOURTNEY L. KECH (#37745)
              *Counsel for Defendants*

---

[23] To the extent Plaintiffs seek payment for the final two pay periods of their employment based upon any "agreed-upon" rates, such facts are relevant only to Plaintiffs' LWPA claims, as they do not have claims under the FLSA.